UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
AINSLEY STEWART,

                     Plaintiff,

        - against -

THE CITY OF NEW YORK and NEW YORK
CITY TRANSIT AUTHORITY,

                     Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-7140 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Ainsley Stewart, proceeding *pro se*, bring this action against Defendants New York City Transit Authority ("NYCTA") and the City of New York alleging claims of racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, New York state law, and New York City law. Before the Court is Defendant NYCTA's motion for summary judgment. For the reasons stated below, Defendant's motion is granted, and the case is dismissed.

## BACKGROUND

**I.    Relevant Facts**[1]

    **A.  Allegations of Racial Discrimination**

Plaintiff, a Black man, began working at the NYCTA in April 1987. (Complaint ("Compl."), Dkt. 1, at ¶¶ 10–11.) In July 2016, Plaintiff opted to work at the Coney Island Overhaul Workshop Plant Maintenance Department Responsibility Center ("CIOH"), where he

---

[1] Unless otherwise noted, a standalone citation to Defendant's 56.1 Statement or Plaintiffs' 56.1 Counterstatement, denotes that this Court has deemed the underlying factual allegation undisputed. Any citations to Defendant's 56.1 Statement or Plaintiff's 56.1 Counterstatement incorporate by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

had the title of Maintenance Supervisor-1 ("MS1").[2] (*Id.* at ¶¶ 18, 21.) MS1s "supervise employees who maintain, inspect, test, examine, lubricate, paint, troubleshoot and make repairs and adjustments on any part of [the NYCTA's] multiple-unit subway cars and subway service cars in the car shops, terminals, yards and on the road." (Dkt. 69, at 29[3].) Plaintiff chose CIOH because CIOH's then-Superintendent Vinny Romanzi ("Romanzi") and then-Deputy Superintendent Thomas Mathai ("Mathai") "invited [him] there[,] . . . . [and] were excited." (Deposition of Ainsley Stewart ("Stewart Dep."), Dkt. 62-2, at 82:9–10; *id.* at 82:13–14 ("[W]ith that encouragement, I picked the job in 2016."); *see also id.* at 84:1–85:2.) Plaintiff and Mathai had known each other "for about ten years" and Mathai had previously supervised him. (*Id.* at 85:4–7, 86:4–11.)[4]

When Plaintiff went to work at CIOH in 2016, Mathai, who is of Indian descent, was his direct supervisor. (Compl. ¶ 21; Stewart Dep., Dkt. 62-2, at 66:8–13.) In March 2017, Mathai was promoted to Superintendent after Romanzi retired. (Stewart Dep., Dkt. 62-2, at 123:10–15.)

---

[2] Plaintiff had worked at CIOH earlier in his career.

[3] Except for deposition transcripts, page numbers refer to the pagination generated by the court's CM/ECF docketing system, and not the document's internal pagination.

[4] Plaintiff's testimony is internally inconsistent as to the nature of his relationship with Mathai prior to 2016. On the one hand, Plaintiff testified that he "had been around Mathai for about ten years without any real problems" and affirmed that Mathai had not racially discriminated against him "at any point" during those ten years. (Stewart Dep., Dkt. 62-2, at 86:4–5, 88:25–89:4; *see also id.* at 94:3–5 ("Prior to . . . March 2017, there was essentially nothing really to complain about.").) On the other hand, Plaintiff testified that Mathai *did* discriminate against him prior to 2016 by "giv[ing] the Indian coworkers preferential treatment where they would . . . get jobs that were more favorable to their interests," and that Plaintiff "would get burdensome assignments." (*Id.* at 90:24–91:12; *see also id.* at 94:7–100:19.) When Plaintiff was asked why he chose to work under Mathai in 2016 if Mathai previously had discriminated against him, Plaintiff stated, "[b]ecause there are certain things you could live with" and that it was "nothing to warrant a complaint when compared to what happened to me from 2017 onward," discussed *infra*. (*Id.* at 91:19–92:8.)

2

Plaintiff's new direct supervisor was Clive Ellis (who is also Black) and Mathai became Ellis's direct supervisor. (Compl., ¶ 27; *see also* Stewart Dep., Dkt. 62-2, at 66:23–68:22.) Plaintiff was one of two Black MS1s at the CIOH at the time. (Stewart Dep., Dkt. 62-2, at 125:9–18.) According to Plaintiff, once Mathai was promoted, he "[s]ubsequently . . . engaged in a pattern of discriminatory treatment towards Plaintiff on the basis of his African-American race." (Compl., ¶ 28.) Plaintiff also alleges that Mathai "was able to influence, contaminate and recruit [other people] to achieve his goal [of discriminating against Plaintiff]," including, *inter alia*, "Steve Halvax, [the] assistant chief mechanical officer, John Santa[m]aria, [] the chief maintenance officer, Leonard Axelrod, the director of labor relations, Ray Duvalier, the superintendent, Kim Moore Ward, [] the vice president of labor relations of New York City Transit, and Joel Andrews, . . . the vice president for EEO and the equal employment opportunity." (Stewart Dep., Dkt. 62-2, at 64:17–65:1, 67:18–22.)

Plaintiff alleges seven incidents of racial discrimination by Mathai against Plaintiff in or after March 2017.

First, Plaintiff alleges that Mathai assigned him "out-of-title work," *i.e.* work above his pay grade, on at least two occasions. (*Id.* at 104:3–21.) In one instance,

> [l]abor relations sent an e-mail to Mathai telling Mathai to have his deputy . . . do [a] disciplinary action notification [for an hourly] employee. Instead of giving the assignment to his deputy, Mathai gave it to me, which was beyond the parameters of my job description. I'm not [a] manager, I'm only a supervisor; and as far as I understand, only managers are authorized to carry out those functions.

(*Id.* at 107:25–108:10; *see also id.* at 108:19–109:24.) In another instance, Plaintiff was "asked by Mathai to assign work to supervisors." (*Id.* at 104:22–105:24.) He alleges that these actions constitute race-based discrimination "[b]ecause it wasn't work that falls under my job description . . . [a]nd there are 11 supervisors," whom "he could have given it to[.]" (*Id.* at 106:11–13; *see*

3

*also id.* at 110:4–111:4.)

Second, Plaintiff alleges that:

> [T]here was a case where an employee showed up for work after a long absence, and Mathai sent him home; and after Mathai sent him home to get the doctor's [note,] . . . he came back to work about a week or so after, and because he wasn't paid for that time that he was away, he filed a grievance. And [after] the grievance, when it got to labor relations, . . . Mathai took me to his office and he accused me of creating a problem with the guy being sent home, which I had nothing to do with.

(*Id.* at 114:24–115:15; *see also id.* at 116:9–118:9.) Plaintiff suffered no disciplinary action or other penalty as a result of this incident.

Third, Plaintiff alleges that, on one occasion, Mathai did not warn him in advance that the Department of Energy Protection ("DEP") was coming to the CIOH to read the water meters. (*See id.* at 136.) Once DEP arrived, Mathai instructed Plaintiff to show them the water meters, which are generally in locked rooms. (*Id.*) Plaintiff knew where the keys were kept due to his experience working at the CIOH and completed the task. (*Id.* at 136:23–137:6.) However, Plaintiff alleges that Mathai was "hid[ing] th[e] information" about the impending DEP visit "just [to] make me fail at the job so he could complain." (*Id.* at 137:7–9.) He further alleges that this incident "was part of [Mathai's] pattern of discriminatory harassment against [Plaintiff]." (*Id.* at 138:17–21.) Plaintiff suffered no disciplinary action or other penalty as a result of this event. (*Id.* at 144:14–145:4.)

Fourth, Plaintiff alleges that Mathai did not warn him that engineers were coming to the CIOH to inspect a construction site. (*Id.* at 140:16–141:6.) As a result, "the job couldn't get done during my tour, and they had to do the job on overtime," even though "Mathai was given prior notification of the visit." (*Id.* at 141:11–24.) Plaintiff suffered no disciplinary action or other penalty related to this event. (*Id.* at 144:14–22.)

Fifth, Plaintiff alleges that a CIOH portable phone used during weekend work, normally

4

kept in Mathai's office, "disappeared . . . and then months later it reappeared." (*Id.* at 145:16–18.) As a result, "no one could get in contact with [Plaintiff] . . . giving them the impression . . . that this guy is never available on the job. Damaging my character." (*Id.* at 146:16–147:2.) According to Plaintiff, this was discrimination "[b]ecause I'm mainly there at weekends." (*Id.* at 149:17–22.) Plaintiff suffered no disciplinary action or other penalty based on this situation. (*Id.* at 150:21–23.)

Sixth, Plaintiff alleges that Mathai told him to improperly countersign a document. Specifically, a cleaner named Robert Rios signed a document starting that he had checked the CIOH eye washers even though "th[e] document . . . stipulate[s] [that] a maintainer [] sign off on it, not a cleaner." (*Id.* at 153:12–15.) Plaintiff suggests that Mathai told Plaintiff to do the sign-off "because he, the cleaner, worked out of title, worked above his title to do the inspections, which is prohibited under transit rules." (*Id.* at 151:15–20.) Plaintiff complained to Ellis that he was not comfortable signing the document and Ellis told him to speak to Mathai. (*Id.* at 151:25–152:9, 154:8–156:17.) Ultimately, Plaintiff did not sign the form because he "felt it was clear entrapment" by Mathai. (*Id.* at 157:5–13.) Plaintiff does not recall if this happened on more than one occasion. (*Id.* at 156:22–157:2.) Plaintiff suffered no disciplinary action or other penalty as a result of this incident. (*Id.* at 157:5–158:3.)

Seventh, Plaintiff alleges that Mathai undermined his efforts to compile weekly mileage reports for CIOH's vehicles by making it difficult for Plaintiff to access the reports he needed. (*Id.* at 158:4–164:20.) Plaintiff suffered no disciplinary action or other penalty related to this situation. (*Id.* at 164:21–25.)

### B. Allegations of Retaliation

On August 4, 2017, Plaintiff sent an email to Mathai, Mathai's superiors, and the director

5

of labor relations entitled "Sup. Mathai's minimum four months of document mistreatment against me." (Dkt. 69, at 49–55.) This was the first time he complained about Mathai's behavior to anyone after "months of silent suffering." (*Id.* at 49.) The email described some of the incidents recited above and accused Mathai of circulating "deliberately false email stories" about Plaintiff. (*Id.*) In relevant part, Plaintiff writes, "Age does matter! The following experience [described in the email] has given me a better understanding and greater appreciation for why there are specific laws to protect employees who fall within a certain age group[,] etc." (*Id.*) Plaintiff also states that Mathai was "harassing [him], treating [him] differently than others similarly situated." (*Id.*) Importantly, the email does not allege that Mathai's conduct was racially motivated. (Defs. 56.1, Dkt. 62-7, ¶ 11.)

According to Plaintiff, after he sent the email, he "face[d] a significant amount of retaliatory discriminatory harassment." (Stewart Dep., Dkt. 62-2, at 169:4–16.) In particular, Plaintiff alleges that (i) his job was reassigned and (ii) he was transferred out of CIOH to another NYCTA facility ("Livonia facility"). (*Id.* at 187:5–24, 201:22–25, 208:18–20.) Plaintiff's reassignment did not involve a diminution in pay or benefits. (*Id.* at 198:14–24.)

A week after Plaintiff sent the email, Mathai reassigned Plaintiff from supervising skilled car inspectors to supervising "unskilled cleaners." (*Id.* at 187:25–188:13.) Plaintiff alleges that this was retaliation because Mathai "replaced me with two of his countrymen from India . . . who ha[d] zero . . . experience" as car inspectors, but the same work title as Plaintiff. (*Id.* at 189:4–25.) Specifically, Plaintiff alleges that Mathai "remov[ed] [him] and eventually kick[ed] him out of Coney Island . . . to facilitate [Mathai's] countrymen replacing [Plaintiff] . . . simply because there was overtime emerging on the job, and Mathai . . . preferred [them] to get overtime that was on

6

the verge of recurring." (*Id.* at 201:8–202–19; *see also id.* at 206:2–22.)[5] Plaintiff alleges that this conduct was race-based because he was the only Black supervisor at the time and, therefore, "less fortunate and easy prey." (*Id.* at 202:21–203:8.)

In November 2017, the cleaners that Plaintiff supervised "complained against [him]," stating that he had "made threats" them, including by making threats against their life. (*Id.* at 211:14–213:14, 216:3–217:14.) According to Plaintiff, the cleaners made these "fabricated" allegations because "Mathai gift[ed] them overtime for work" and "repaid them in many different ways, . . . to go up against me." (*Id.* at 219:9–25, 230:2–17; *see also id.* at 220:17–20 ("[T]his type of stuff here is all part of a concerted effort of fabrication, a conspiracy to mislead people.").) On December 5, 2017, John Santamaria ("Santamaria"), the acting vice president and chief mechanical officer in NYCTA's employee placement office, sent Plaintiff a memorandum stating that he was being transferred from CIOH to another maintenance shop. (*Id.* at 235:12–23.) Santamaria consulted with an appointed representative from Plaintiff's union in deciding to transfer him. (*Id.* at 236:21–237:18.) According to Plaintiff, Santamaria "arbitrarily" transferred him "to further Mathai's goals against me . . . [t]o get me out of the shop." (*Id.* at 236:8–13; *see also id.* at 236:13–19 ("Because [Mathai's] goal to get me out with the bogus complaint [from the cleaners] did not work, so to ensure that it happens now, Mathai obviously influenced, contaminated and recruited [Santamaria] in the process to exact this type of arbitrary judgment against me[.]").) Plaintiff alleges that this transfer was retaliatory because "Mathai provided [Santamaria] false information." (*Id.* at 239:6–14.)

Plaintiff alleges that he has earned "very, very little" overtime since being reassigned to

---

[5] Plaintiff also alleges that Mathai's conduct "foreclosed on [Plaintiff's] opportunities to . . . be promoted," but that he did not actually apply for any promotions. (Stewart Dep., Dkt. 62-2, at 204:22–205:11.)

7

supervising cleaners and leaving CIOH, whereas the people who replaced him as car inspectors at CIOH have earned "[a] whole lot, because they have overtime at the location." (*Id.* at 207:4–13; *see also id.* at 209:9–16 ("I would be making more overtime . . . if I was supervising skilled workers.").) In 2019, Plaintiff attempted to transfer back to CIOH, but Steven Halvax, an assistant chief mechanical officer who reported to Santamaria, did not allow him to do so. (*Id.* at 242:21–244:16.). Plaintiff remains employed as an MS1 at the NYCTA. (Compl., ¶ 97.)

## II.   Procedural History

Plaintiff filed his complaint in this matter on December 14, 2018, asserting claims for: (1) racial discrimination in violation of 42 U.S.C. § 1981; (2) racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964; (3) racial discrimination and retaliation in violation of New York State Human Rights Law; and (4) discrimination and retaliation in violation of New York City Human Rights Law. (Dkt. 1.) Plaintiff was initially represented by counsel but, sadly, his counsel passed away in December 2020. (Dkts. 39, 41.) Plaintiff is now proceeding *pro se*, including with respect to the instant motion. (Dkt. 42.) Defendant's motion for summary judgment was fully briefed on February 24, 2022. (Dkt. 62.)

## LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (holding that the summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th

8

247, 259 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248). "To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden to demonstrate the absence of any genuine issues of material fact . . . ." *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 541 (2d Cir. 2019). Once this burden is met, the burden shifts to the nonmoving party to proffer some evidence establishing the existence of a question of material fact that must be resolved at trial. *See Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 143 (2d Cir. 2013) (quoting *Anderson*, 477 U.S. at 252). That is, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"[A]t the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence . . . ." *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021). It must "consider the record in the light most favorable to the non-movant" and "resolve all ambiguities and draw all factual inferences in favor of the non-movant 'if there is a "genuine" dispute as to those facts.'" *Loreley*, 13 F.4th at 259 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "[T]he district court may not properly consider the record in piecemeal fashion; rather, it

9

must 'review all of the evidence in the record.'" *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000)).

If a plaintiff's operative complaint was drafted by counsel before plaintiff elected to proceed *pro se* for motion practice, that complaint is "not deserving of the special solicitude due [to] *pro se* litigants." *Clarke v. White Plains Hospital*, 650 F. App'x 73, 75 (2d Cir. 2017). Moreover, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (citation omitted).

**DISCUSSION**

**I.     Defendant's Motion for Summary Judgment is Granted as to Plaintiff's Title VII and Section 1981 Racial Discrimination Claims.**

Plaintiff's employment discrimination claims pursuant to Title VII and Section 1981 are analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Asiedu v. Broadreach Med. Res.*, No. 19-CV-11825 (ER), 2022 WL 4237077, at *9–10 (S.D.N.Y. Sept. 13, 2022). "Under the *McDonnell Douglas* framework, a plaintiff alleging discrimination must first demonstrate *a prima facie* case of discrimination." *Id.* at *9. To prove a *prima facie* case of discrimination, a plaintiff must show that: "(1) []he is a member of a protected class; (2) []he was qualified for the position in question; (3) []he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Id.* at *10. If a plaintiff successfully presents a *prima facie* case of discrimination, the defendant must then rebut the presumption by offering legitimate and non-discriminatory reasons for the adverse employment action demonstrated in plaintiff's *prima facie* case. *Id.* at *9. Under the third step of

the *McDonnell Douglas* framework, the burden then shifts back to the plaintiff to prove intentional discrimination by a preponderance of the evidence. *Id.*

Here, Plaintiff has failed to establish that he suffered an "adverse employment action" for purposes of proving a *prima facie* claim of discrimination. An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000), *abrogated on other grounds as recognized in Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 43–44 (2d Cir. 2019) (clarifying legal standard for retaliation claims). In this case, Plaintiff concedes that he was not subjected to any penalty, discipline, or any other occupational consequence as a result of Mathai's alleged acts of discrimination; rather, he only alleges that he suffered "[a] lot of mental torment and anxiety." (Stewart Dep., Dkt. 62-2, at 157; *see also id.* at 243 (describing "stress [and] anxiety" after being assigned away from Coney Island in July 2019), 257–59 (similar).) It is well-established that "[a]ctions that cause a plaintiff embarrassment or anxiety are insufficient to qualify as an adverse action because such intangible consequences are not materially adverse alterations of employment conditions." *Miksic v. TD Ameritrade Holding Corp.*, No. 12-CV-4446 (AJN), 2013 WL 1803956, at *3 (S.D.N.Y. Mar. 7, 2013) (citation and internal quotations marks omitted). As Plaintiff has not asserted "any tangible negative consequences beyond verbal reprimands, warnings, and admonishments" due to Mathai's alleged discriminatory acts, he has failed to establish an adverse employment action. *Harge v. City of N.Y.*, No. 16-CV-5160 (LJL), 2021 WL 3855305, at *11 (S.D.N.Y. Aug. 26, 2021).

Moreover, even if Plaintiff could establish an adverse employment action, he has failed to demonstrate that such an action took place under circumstances giving rise to an inference of discrimination. "[T]he inference of discriminatory intent could be drawn in several circumstances

11

including, but not limited to: . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (citation omitted). Plaintiff does not identify any derogatory statements about his race by any person with whom he worked, and he does not even allege, let alone prove, that, with respect to his racial discrimination claims, his treatment was inferior to that afforded to any other individuals employed by Defendant.

Therefore, Defendant's motion for summary judgment on Plaintiff's Title VII and Section 1981 racial discrimination claims is granted.

## II. Defendant's Motion for Summary Judgment is Granted as to Plaintiff's Title VII Retaliation Claim.

To establish a *prima facie* case of retaliation, a plaintiff-employee "must show that (1) []he engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the protected activity and the adverse action." *White v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 18-CV-3627 (GBD), 2022 WL 4227289, at *7 (S.D.N.Y. Sept. 13, 2022) (citation omitted). A plaintiff may present proof of causation either "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," or "indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

Here, Plaintiff alleges that he was reassigned and transferred out of CIOH after complaining about Mathai's conduct in the August 4, 2017 email. While such activities can constitute an "adverse action" under Title VII, Plaintiff has failed to meet "[t]he critical requirement . . . that the complaint must be sufficiently specific to make it clear that the employee

is complaining about conduct prohibited by Title VII." *Balogun v. N.Y. State Div. of Human Rights*, No. 20-CV-10484 (LGS), 2022 WL 4292704, at *7 (S.D.N.Y. Sept. 16, 2022) (citation and internal quotation marks omitted). In other words, "[t]he onus is on the speaker to clarify to the employer that [he] is complaining of unfair treatment due to [his] membership in a protected class, not just unfair treatment generally." *Id.* (citation and internal quotation marks omitted). While Plaintiff's email states that Mathai is "[h]arassing [him], treating [him] differently than others similarly situated," (Dkt. 69, at 49), it does not allege that Mathai's conduct is racially motivated or based on Plaintiff's race.[6] (Defs. 56.1, Dkt. 62-7, ¶ 11.) "General complaints about a supervisor's behavior, when there is no indication . . . that [defendants] knew or should have known that the behavior was the result of a discriminatory motive, are not protected activity." *Marseille v. Mount Sinai Health Sys., Inc.*, No. 18-CV-12136 (VEC), 2021 WL 3475620, at *12 (S.D.N.Y. Aug. 5, 2021) (citation and internal quotations omitted). As Plaintiff does not point to any evidence demonstrating that he was retaliated against based on a claim of racial discrimination, his claim fails. *See, e.g.*, *Harris v. Off. of New York State Comptroller*, No. 20-CV-8827 (LAP), 2022 WL 814289, at *17 (S.D.N.Y. Mar. 17, 2022) (finding that a plaintiff's complaint about work was not protected activity because he "does not allege that he ever explicitly raised the issue of gender discrimination when he complained about his work"); *Carter v. Fresenius Kabi USA, LLC.*, No. 19-CV-01183 (JJM), 2022 WL 2757726, at *7 (W.D.N.Y. Jan. 12, 2022) ("There being no evidence in the record that [plaintiff] connected race to his complaints of being 'targeted' by [his supervisor], I conclude that no protected activity occurred."), *report and recommendation adopted*, No. 19-CV-1183, 2022 WL 2045359 (W.D.N.Y. June 7, 2022).

---

[6] To the extent that the letter can be construed to allege Plaintiff's membership in any protected class, it is with respect to Plaintiff's age. (*See* Dkt. 69, at 49 ("Age does matter!").) However, Plaintiff does not allege age discrimination in this case.

13

Additionally, Plaintiff has failed to establish that the alleged retaliation "was a 'but-for' cause of the adverse action." *Abromavage v. Deutsche Bank Sec. Inc.*, No. 21-668, 2022 WL 4360950, at *1 (2d Cir. Sept. 21, 2022) (citation and internal quotation marks omitted). Plaintiff does not dispute that the decision to move him from CIOH to the Livonia facility was made in conjunction with Plaintiff's union representative, who is not employed by the NYCTA. Therefore, Plaintiff cannot demonstrate, as he is required to do, that "the adverse action would not have occurred in the absence of the retaliatory motive." *de Souza v. Planned Parenthood Fed'n of Am., Inc.*, No. 21-CV-5553 (LGS), 2022 WL 2047580, at *4 (S.D.N.Y. June 7, 2022).

Therefore, Defendant's motion for summary judgment is granted with respect to Plaintiff's Title VII retaliation claim.

### III. Plaintiff's Claims Against the City of New York Are Dismissed.

Despite the case caption, it is not clear from the face of the complaint whether the City of New York is a defendant in this action. (*See* Compl., ¶ 9 (only listing NYCTA as a defendant)); *see also Manko v. Lenox Hill Hosp.*, No. 20-CV-9928 (LTS), 2021 WL 2784552, at *4 (S.D.N.Y. July 2, 2021) ("The NYCTA is an independent public authority that has the capacity to sue and be sued."). However, to the extent Plaintiff is attempting to bring the above-described claims against the City of New York, they are dismissed for the reasons discussed above.

### IV. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's NYSHRL and NYCHRL Claims.

In light of the Court's dismissal of Plaintiff's federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims, which are therefore dismissed without prejudice to bring in state court. *See D'Amore v. City of New York*, No. 17-CV-1748 (PKC) (ST), 2019 WL 2571157, at *8 (E.D.N.Y. June 21, 2019), *aff'd*, 807 F. App'x 140 (2d Cir. 2020).

## CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment is granted as to Plaintiff's Title VII and Section 1981 claims. The Court declines to exercise jurisdiction over Plaintiff's state and city law claims, which are dismissed without prejudice to bring in state court. This case is dismissed. The Clerk of Court is respectfully directed to enter judgment accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 27, 2022
        Brooklyn, New York